UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

National DME, L.C.

    Plaintiff

v.

Tonya Katsikas,

    Defendant

Case No. 2:23-cv-01243-CDS-NJK

**Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment**

[ECF No. 51]

    Plaintiff National DME, L.C. brings this action against defendant Tonya Katsikas alleging (1) intentional interference with contractual relations and (2) breach of contract. *See generally* Am. compl., ECF No. 13. On September 19, 2024, Katsikas filed a motion for summary judgment. Mot. for summ. j., ECF No. 51. National DME filed its opposition on October 10, 2024. Opp'n, ECF No. 54. Katsikas filed her reply on October 21, 2024. Reply, ECF No. 56. For the reasons herein, I grant in part and deny in part Katsikas's motion for summary judgment,

**I.    Background**

    National DME sells "durable medical equipment such as crutches, braces, slings, on consignment" at "professional orthopedic medical offices" in Las Vegas, Nevada. Katsikas decl., Def.'s Ex. 5, ECF No. 52-5 at ¶ 3. National DME employed Katsikas from July 2022 to July 2023. *Id.* at ¶ 4. Her job was to "find and develop relationships with orthopedic medical professionals in Las Vegas and sign them to a service contract" with National DME. *Id.* When she was hired, National DME had Katsikas sign a confidentiality agreement in which she stated that she understood that working at National DME meant she may come into possession of confidential information and that she agreed to not share that information or access the confidential information for use for anything outside of her job. Katsikas dep., Def.'s Ex. 7, ECF No 52-7 at 12–14. During her employment, Katsikas signed three of her pre-existing clients to service

contracts with National DME. ECF No. 52-5 at ¶ 5; *see* Contracts, Def.'s Exs. 12A, 12B, 12C, ECF Nos. 52-12, 52-13, 53-1. The three clients are The Minimally Invasive Hand Institute ("Hand Institute"), ASM Orthopedics ("ASM"), and the Institute of Orthopedic Surgery of Nevada ("IOS"). ECF No. 52-2 at ¶ 5. Katsikas was terminated on July 20, 2023. ECF No 52-7 at 15:4–6. Approximately one week after Katsikas's termination, the Hand Institute, ASM, and IOS terminated their agreements with National DME. Cottis decl., Pl.'s Ex. A, ECF No. 54-1 at ¶ 8.

## II.    Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary-judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).

## III.    Discussion

Katsikas argues that she is entitled to summary judgment on both the intentional interference claim and the breach of contract claim. I address each in turn.

**A. Katsikas is entitled to summary judgment in part on the intentional interference claim.**

National DME alleges that Katsikas intentionally interfered with contractual relations because she "improperly disparage[ed] the quality of National DME as a means to encourage clients to cease doing business with National DME." ECF No. 13 at ¶ 19. In Nevada, a claim for intentional interference with contractual relations exists when "(1) there is a valid and existing contract; (2) defendant has knowledge of the contract; (3) defendant's acts are intentional and intended or designed to disrupt the contractual relationship; (4) actual breach or disruption of the contract occurs; and (5) plaintiff is harmed by the disruption or breach." *Donor Network W. v. Nev. Donor Network, Inc.*, 2025 U.S. Dist. LEXIS 15606, at *6 (D. Nev. Jan 29, 2025) (citing *Sutherland v. Gross*, 772 P.2d 1287, 1290 (Nev. 1989)). Katsikas puts forth several arguments as to why she is entitled to summary judgment on this claim.

### 1. *Causal connection*

First, Katsikas argues that there is no evidence in the record demonstrating that the Hand Institute, ASM, and IOS terminated their agreements because of any disparaging comments allegedly made by Katsikas. ECF No. 51 at 10. Katsikas provides declarations from the Hand Institute, ASM, and IOS that all state that she did not persuade them to terminate their contracts, she did not disparage National DME, and that each of them had not terminated their contracts with National DME because of Katsikas's words or conduct. *Id.* at 11 (citing Rapp (IOS) decl., Def.'s Ex. 1, ECF No. 52-1 at ¶¶ 3–5, 10; Gaje (Hand Institute) decl., Def.'s Ex. 2, ECF No. 52-2 at ¶¶ 3–5, 10; Rose (IOS) decl., Def.'s Ex. 3, ECF No. 52-3 at ¶¶ 3–5, 10; Martin (ASM) decl., Def.'s Ex. 4, ECF No. 52-4 at ¶¶ 3–5, 7). Katsikas also argues that in her own deposition she testified that the Hand Institute, ASM, and IOS contacted her after they terminated their contracts and asked for her advice because she held pre-existing business relationships with each party and each party wished to continue doing business with her. *Id.* (citing ECF No. 52-7 at 15:16–16:3, 25:9–27:18, 31:4–21). To support her argument that she is entitled to summary

judgment, Katsikas cites *Silver State Broad., LLC v. Beasley FM Acquisition*, where "the court granted summary judgment for a defendant alleged to have interfered with contractual relations, because the third parties whose contracts were allegedly interfered with testified that they did not cancel their contracts due to any alleged interference by the defendants." *Id.* (citing 148 F. Supp. 3d 1132, 1138–39 (D. Nev. 2015)).

In response, National DME argues that there is a genuine issue of material fact as to why the Hand Institute, ASM, and IOS terminated their agreements; it argues that Katsikas and the three companies worked together to determine the proposed reasons for terminating the contracts. ECF No. 54 at 4.[1] Regarding the Hand Institute, National DME points to text messages between Katsikas and the Hand Institute's Dr. Sorelle, in which they discussed the reasoning for the Hand Institute's cancellation of its contract with National DME. *Id.*; *see* Sorelle texts, Pl.'s Ex. H, ECF No. 54-8. In the messages, Sorrelle allegedly writes: "I'll just tell them that we are dropping them [because] they can't logo my exos splints and we are losing a lot of money, it'll keep you out of it." ECF. 54-8 at 2. These text messages, National DME argues, directly contradict Sorelle's deposition in which he stated (1) he did not have a relationship with Katsikas, (2) the Hand Institute had not analyzed revenue data, and (3) he was unaware that any Exos braces had logos. ECF No. 54 at 4; *see* Sorelle dep., Pl.'s Ex. 6, ECF No. 52-6 at 9:12–16; 11:21–24; 13:9–12. National DME also states that Gary Gaje's statements in his declaration as to why the Hand Institute terminated its contract with National DME conflict with statements he

---

[1] National DME takes issue with Katsikas's framing of the fourth element, actual disruption, as "causal connection." ECF No. 54 at 18. However, this is a distinction without a difference. The fourth element of the test for intentional interference with contractual relations asks whether the conduct the defendant is alleged to have engaged in actually did cause a breach of disruption of the contract. *See Rimini St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158, 1224–25 (D. Nev. 2020) (finding that expenditures to investigate and eliminate confusion **caused** by misrepresentations were sufficient to allege actual disruption) (emphasis added); *see also Chocolate Magic Las Vegas LLC v. Ford*, 337 F. Supp. 3d 950, 961 (D. Nev. 2018) (finding costly re-assignments and efforts to quell employee confusion **caused** by defendant's interference sufficient to allege disruption) (emphasis added). The case National DME cites to, *Allstate Ins. Co. v. Shah*, 2023 U.S. Dist. LEXIS 155388, at * 9 (D. Nev. July 17, 2023), merely acknowledges that a contract does not have to be terminated to be disrupted; the contract becoming more costly or burdensome is sufficient to demonstrate actual disruption.

4

has made in the past to National DME Field Operations Manager Mark Neth. ECF No. 54 at 4 (citing ECF No. 52-2 at ¶ 9 and Neth decl., Pl.'s Ex. K, ECF No. 54-11 at ¶ 9). As to ASM, National DME argues that ASM provides no explanation for the reason that Katsikas visited ASM four days after she was discharged and a week before ASM terminated its agreement with National DME. ECF No. 54 at 5. Finally, as to IOS, National DME argues that IOS provides no explanation for why Katsikas met with employees of IOS five days after she was fired and one day before IOS terminated its agreement with National DME. *Id.* In reply, Katsikas reiterates the declarations from all three companies stating that she did not make any disparaging statements about National DME and did not induce the three companies into terminating their agreements with National DME.

To determine whether Katsikas is entitled to summary judgment, the court is guided by the complaint as the "complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291 (9th Cir. 2000). Further, "[a] plaintiff cannot raise a new theory of liability in the plaintiff's opposition to a motion for summary judgment or summary adjudication." *Torres v. City of Madera*, 655 F. Supp. 2d 1109, 1128 (E.D. Cal. 2009). "If the complaint focuses on one theory of liability, the plaintiff cannot turn around and surprise the defendant at the summary judgment stage with a new theory of liability." *Id.* (citing *Coleman*, 232 F.3d at 1292–93). Here, the complaint specifically alleges that Katsikas "intentionally interfered with the contractual relations between National DME and its clients by **improperly disparaging the quality of National DME as a means to encourage clients to cease doing business with National DME** . . . ." ECF No. 13 at ¶ 19 (emphasis added). Therefore, for National DME to defeat summary judgment, it must provide evidence indicating there is a genuine issue of material fact as to whether Katsikas's improper disparagement caused the Hand Institute, ASM, and IOS to terminate their contracts. There is no question that National DME provides evidence creating a genuine issue of material fact as to whether Katsikas and these three companies were

having conversations after she was terminated from National DME and before the companies terminated their agreements with National DME. However, for both IOS and ASM, there is no evidence about any **disparaging statements** Katsikas made encouraging either company to terminate its agreements. Without this evidence, I cannot find that there is evidence in the record to support what is alleged in the complaint—that Katsikas made disparaging statements to IOS and ASM which caused them to terminate their contracts—and Katsikas is entitled to summary judgment as to the claims related to IOS and ASM.

Regarding the Hand Institute, Gary Gaje, the business manager for Dr. Jonathan Sorelle, stated in his declaration that the Hand Institute "terminated its contract with National DME because they were unable to satisfy our request for logos on our splints. **Tonya Katsikas was our sales rep with National DME and related to us National DME's position that it was not cost effective for them to put the logos on our splints**." ECF No. 52-2 at ¶ 9 (emphasis added). National DME contends that the bolded part of Gaje's statement is false. ECF No. 54 at 4. Therefore, although scant, there is just enough evidence that Katsikas made what could be interpreted as a disparaging statement about National DME to the Hand Institute. This, combined with National DME's evidence of the text messages between Sorelle and Katsikas in which they discuss the purported reason for terminating the Hand Institute's contract with National DME, creates a genuine issue of material fact as to whether Katsikas caused the Hand Institute to terminate its contract with National DME in the manner described in the amended complaint. Therefore, I continue analyzing the elements of an intentional interference claim solely as they relate to the Hand Institute.

### 2. *"Intentional" requirement*

Katsikas next argues that she is entitled to summary judgment on the intentional interference claim because there is no evidence that she employed "unlawful or improper" means of interference, or that she acted with a "specific intent" or "specific motive or purpose to injure" ECF No. 51 at 12 (citing *Pickett v. McCarran Mansion, LLC*, 133 Nev. 1061 (Nev. App. 2017) (Tao, J.,

concurring); *Werbicky v. Green Tree Servicing*, LLC, 2016 WL 1248697, at *14 (D. Nev. Mar. 28, 2016) and *Operation: Heroes, Ltd. v. Procter & Gamble Prods., Inc.*, 2015 WL 5768534, at *5 (D. Nev. Sept. 29, 2015)). She cites *National Right to Life Political Action Committee v. Friends of Bryan*, to support her argument that an intentional interference with contractual relations claim requires evidence of improper and unjustified motives to survive summary judgment. *Id.* at 12–13 (citing 741 F. Supp. 807, 817 (D. Nev. 1990)). According to Katsikas, the evidence demonstrates that "shortly after Plaintiff unceremoniously fired her without cause, several of her pre-existing clients (who subsequently joined National DME because she began working there) *contacted her* to discuss moving on with her in lieu of National DME." *Id.* at 13.

      In response, National DME argues that Katsikas misconstrues the intent required for an intentional interference claims. ECF No. 54 at 16. National DME argues that the intent requirement here does not require a showing of specific intent to hurt the plaintiff but requires "that the defendant 'desires to bring [the interference] about' or 'knows that the interference is *certain or substantially certain* to occur as the result of the action.'" *Id.* at 16–17 (citing *LKimmy, Inc. v. Bank of Am.*, 2022 U.S. Dist. LEXIS 46455, *14 (D. Nev. Mar. 16, 2022)). National DME further explains that Katsikas admits that she assisted the Hand Institute in terminating its contract, the Hand Institute gave National DME a false reason as to why it was terminating its contract, and before Katsikas was terminated, she told National DME CEO Scott Cottis and Mark Neth that the Hand Institute was her client and she could take it with her when she left. *Id.* at 17. Additionally, National DME argues that Neth's declaration stating that Kastikas's conduct violated industry practices is sufficient to create a genuine issue of material fact as to whether Katsikas intended to disrupt the Hand Institute's contract with National DME. *Id.* To support this argument, National DME cites to *Allstate Ins. Co. v. Shah*, in which the court "found that the clinic's evidence that the insurer's conduct was not consistent with ordinary practices in adjusting insurance claims was . . . sufficient that a reasonably jury could conclude it was intended to disrupt the lien contracts." *Id.* (citing 2023 U.S. Dist. LEXIS 155388, at *12–13 (D.

7

Nev. July 17, 2023)). In her reply, Katsikas argues that National DME attempts to replace the requirement for intentional interference into one of negligent interference and that "controlling and persuasive case law" demonstrates that mere knowledge of the existence of a contract is not enough to support a finding of intentional interference. ECF No. 56 at 5–6.

National DME is correct in that the Supreme Court of Nevada has held that the "intent" element of intentional interference requires only that the defendant "desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *Las Vegas-Tonopah-Reno Stage Lines v. Gray Line Tours*, 792 P.2d 386, 388 (Nev. 1990) (quoting Restatement (Second) of Torts § 766B(d) (1979)); *see Herman v. Venetian Casino Resorts LLC*, 2021 Nev. Unpub. LEXIS 837, at *3 (Nev. 2021) (stating that appellants failed to show that appellee was "substantially certain that [its service charge policies would] interfere[] with [contractual] relationships"). Additionally, Katsikas is also correct that "mere knowledge of the contract is insufficient" to establish intent. *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1268 (Nev. 2003).

Given that Katsikas admits she worked with the Hand Institute in terminating its contract with National DME, and that Neth declares that Katsikas falsely told the Hand Institute that it was not cost effective for National DME to put logos on the Exos braces when in reality Exo's manufacturer was unwilling to provide logos on Exos braces, I find that, looking at the facts in a light most favorable to National DME, a reasonable juror could find that Katsikas desired to get the Hand Institute to terminate its contract with National DME, or was substantially certain that the Hand Institute would terminate its contract with National DME as a result of her alleged lie. Consequently, Katsikas is not entitled to summary judgment as to this issue.

Katsikas next argues that she is entitled to summary judgment on the intentional interference with contractual relations claim because the Hand Institute's contract was an at-will contract and her conduct was not malicious or improper and because "inducing or assisting a party to a contract to exercise a legal right to terminate their contract cannot be the basis for

liability for tortious interference with contractual relations." ECF No. 51 at 14 (citing 44B Am. Jur. 2d Interference § 21). In response, National DME argues that the contracts were not at-will but required a party terminating to give a sixty-day notice and state the reason for termination. ECF No. 54 at 19. "Once 60 days notice was provided, the Working Agreements allowed 30 days for the state breach to be remedied and, upon satisfactory correction of the breach, the termination shall be deemed canceled." *Id.* at 20. National DME says that the Hand Institute provided only thirty days' notice and that its decision to provide a false reason for termination was akin to providing no reason for termination. *Id.* at 19–20. In her reply, Katsikas reiterates that the contracts are at-will, and states that, because they are at-will contracts, National DME must "plead and prove that the defendant engaged in an independently wrongful act." ECF No. 56 at 8. Although National DME pled business disparagement as the independently wrongful act, Katsikas argues that there is no evidence of any business disparagement. *Id.* at 9.

>   The language of the contract at issue states
>
>   The term of this Agreement shall extend for three (3) years from the date of execution. During the term hereof, either party may initiate termination by communicating, to the other, in writing the reason(s) for the termination. Termination may be by written notification sixty (60) days in advance, or the failure of either party to comply with the conditions expressed in this Agreement. Notice of failure to comply should contain specific details of the action. Each party hereto shall have thirty (30) days to remedy stated breach and upon satisfactory correction of the breach the termination shall be deemed canceled.

ECF No. 52-13 at 7. Therefore, there are two possible ways to terminate the agreement. The first way allows for termination for any reason as long as there is written notification sixty days in advance. The second way allows for termination with less than sixty days' notice as long as, one of the party's fails to comply with the express terms of the contract, and the party wishing to terminate the agreement provides specific details of how the non-terminating party failed to comply with the agreement and then waits thirty days for the non-terminating party to remedy the alleged failure to comply. An at-will contract "can be terminated at any time by either party for any reason or no reason at all." *Sys. W. Performance v. Johnson*, 2020 U.S. Dist. LEXIS 51029, at

*10 (D. Utah Mar. 23, 2020) (citing Supreme Court case law in case citing Utah law).[2] Here the contract is only partially at-will. If a party wants to terminate and provide sixty days' notice—it is an at-will contract. However, if a party is attempting to terminate the contract with less than sixty days' notice, the contract only allows for termination for "failure of either party to comply with the conditions expressed in this Agreement." ECF No. 52-13 at 7. It also requires that the non-terminating party have an opportunity to cure. *Id.* Therefore, because the Hand Institute provided only thirty-days' notice, it could only terminate the contract if National DME failed to comply with the express conditions in the contract and it must allow National DME thirty days to correct the alleged breach. Thus, the contract was not at-will so National DME does not need to provide evidence of malicious intent to survive summary judgment. Katsikas is not entitled to summary judgment on this basis.

Katsikas next argues that she was acting to protect her own interests and therefore the privilege doctrine bars recovery for intentional interference with contractual relations. ECF No. 51 at 17. In response, National DME argues that Katsikas acted with improper or unlawful means and therefore is not entitled to the privilege doctrine. ECF No. 54 at 21. In her reply, Katsikas argues there is no evidence that she acted unlawfully or with improper means; she was merely acting to maintain her pre-existing clients and prospective business relationship with the Hand Institute. ECF No. 56 at 11–12.

Nevada law states that a privilege or justification exists to defeat an intentional interference with prospective economic advantage claim when a defendant acts to protect her own interests. *Rimini St. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158, 1185 (D. Nev. 2020) (citing *Leavitt*

---

[2] Neither party mentions that the contract is governed by Utah law. *See* Hand Institute working agreement, Pl.'s Ex. 12a, ECF No. 52-12 at 7 ("[T]he law of the State of Utah shall govern the interpretation and construction of this Agreement."). Therefore, although neither party cites to Utah law in support of its interpretation of the terms of the agreement, I cite to Utah case law here. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941) (stating that generally a federal court sitting in diversity applies the forum state's choice of law rules); *Ferdie Sievers & Lake Tahoe Land Co. v. Diversified Mortg. Invs.*, 603 P.2d 270, 273 (Nev. 1979) ("[P]arties are permitted within broad limits to choose the law that will determine the validity and effects of their contract.").

*v. Leisure Sports Inc.*, 734 P.2d 1221, 1226 (Nev. 1987)). "This privilege applies when a defendant acts 'to protect the interests they had acquired via a valid contract.'" *Id.* Although the Supreme Court of Nevada has not spoken directly on this issue, the court in *Rimini St.* predicted[3] that the Supreme Court of Nevada would extend this privilege doctrine to "encompass the tort of intentional interference with contractual relations." 473 F. Supp. 3d at 1186. The court reasoned that

> [a]bsolute privilege is included in the Restatement approach to intentional contractual interference, and "Nevada state courts often follow the Restatement approach to the interference torts." [*Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1055, n.2 (9th Cir. 2008)]. Moreover, as previously mentioned, the elements of interference with contractual relations are nearly identical to interference with prospective economic advantage. *See In re Amerco Derivative Litigation*, 127 Nev. 196, 252 P.3d 681, 702 (Nev. 2011) (providing the elements for interference with prospective economic advantage). The only relevant difference between the elements of the two torts is that a prospective economic advantage plaintiff must prove "the absence of privilege or justification by the defendant." *Id.* In *Leavitt v. Leisure Sports Incorporation*, the Nevada Supreme Court applied the doctrine of absolute privilege to a case where the plaintiffs, *inter alia*, asserted a claim of intentional interference with prospective economic advantage. 734 P.2d at 1225–26. The *Leavitt* Court ruled in favor of the defendants, applying the absolute right doctrine and noting that they had "acted to protect the interests they had acquired via a valid contract." *Id.* at 1226. In doing so, the Court cited to out of jurisdiction cases where courts had applied the absolute privilege doctrine to the tort of intentional interference with contractual relations, noting that "these cases dealt with wrongful interference of contract which is a species of the broader tort of interference with prospective economic advantage." *Id.* It is evident that the Nevada Supreme Court views the two torts as exceedingly similar.

*Id.* Since *Rimini St.*, at least one other court in this district has applied the same analysis to allow the absolute privilege doctrine to extend to an intentional interference with contractual relations claim. *See V5 Techs., Ltd. v. Switch, Ltd.*, 2021 U.S. Dist. LEXIS 8282, at *25 (D. Nev. Jan. 15, 2021) ("This Court agrees with [the *Rimini St.* analysis] and extends the absolute privilege doctrine to [plaintiff's] intentional interference with contractual relations claim"). As this

---

[3] "When state law is unclear and the highest court of the state has not ruled on the issue, federal courts are tasked with predicting how that court might decide the issue." *Rimini St.*, 473 F. Supp. 3d at 1185 (citing *Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1045–46 (9th Cir. 2001)).

appears to still be an open question of Nevada law, I agree with and therefore adopt the reasoning in *Rimini St.* predicting that the Supreme Court of Nevada would extend the privilege and analyze whether there is a genuine issue of material fact as to whether Katsikas is entitled to this privilege.

In applying the privilege doctrine to an interference with prospective economic advantage claim, a court in this district explained that "activity is not privileged or justified if the party 'resort[s] . . . to unlawful or improper means.'" *Allstate Ins. Co.*, 2023 U.S. Dist. LEXIS 155388, at *16 (citing *Crockett v. Sahara Realty Corp.*, 591 P.2d 1135, 1137 (Nev. 1979)). In that case, Chief District Judge Andrew P. Gordon held that a genuine issue of material fact existed as to whether the defendant was entitled to the privilege doctrine because there were questions as to whether the defendant acted improperly in his discussions with the third parties involved. *Id.* Here, National DME provides evidence that Katsikas was told that any attempt to solicit business from the Hand Institute at the expense of its contract with National DME would violate the Hand Institute's contract with National DME. Cottis decl., ECF No. 54-1 at ¶ 13. There is also evidence that Katsikas's communications with the Hand Institute violated ordinary and accepted practices within the "durable medical equipment industry." *Id.* at ¶ 12. Again, while scant, this evidence is sufficient for there to be a genuine issue of material fact as to whether Katsikas's conduct was not privileged or justified. Katsikas is not entitled to summary judgment on this basis.

Katsikas next argues that National DME's intentional interference claim fails under the "friendly advice doctrine." ECF No. 51 at 19. Katsikas surmises that she cannot be liable because she gave truthful information or honest advice within the scope of a request for advice. *Id.* In response, National DME argues that the advice Katsikas gave was not truthful or honest, as Katsikas helped the Hand Institute terminate its contract outside the bounds allowed by the contract between National DME and the Hand Institute. ECF No. 54 at 21. Further, National DME states that Nevada has not adopted the friendly advice doctrine and the court should not

consider it. *Id.* Katsikas does not address these arguments in her reply. As there is no indication that Nevada has adopted the friendly advice doctrine, and Katsikas failed to address this in her reply, I decline to apply the friendly advice doctrine here. Katsikas is not entitled to summary judgment based on this doctrine.

Finally, Katsikas argues that the "free competition doctrine" bars National DME's intentional interference claim. ECF No. 51 at 20. She surmises that "[w]here an existing contract is terminable at will, and where all the elements of the privilege of fair competition are met, a competitor may take action to attract business, even if that action results in an interference with another's existing contract." *Id.* (quoting 44B Am. Jur. 2d Interference § 29 (May 2024)). In response, National DME argues (1) Nevada has not adopted this doctrine and (2) Katsikas's argument is premised on the Hand Institute's contract being at-will, which it is not. ECF No. 54 at 21–22. Katsikas does not address the free competition doctrine in her reply. As I explained above, I find that, because the Hand Institute attempted to terminate the contract with only thirty days' notice, it could only terminate the contract for cause—i.e. failure of the non-terminating party to comply with the express terms of the agreement, and not pursuant to the provision that would have permitted at-will termination. Therefore, even if I were to adopt the free competition doctrine—which, at this time, I do not—it does not apply here. Katsikas is not entitled to summary judgment on this basis.

As stated, there are several outstanding genuine issues of material fact on the intentional element of this claim specifically as to the Hand Institute. Katsikas is not entitled to summary judgment on this element.

### 3. Damages

Katsikas argues that she is entitled to summary judgment on the intentional interference claim because National DME has no evidence of damages attributable to her. ECF No. 51 at 21. Specifically, Katsikas argues that National DME's expert based his damages analysis on "several untested and unverified assumptions" and thus his report is unreliable and should not be

13

admitted. *Id.* at 22. In response, National DME argues that their expert, Gavin Harris, is a C.P.A. who has provided a reliable expert report. ECF No. 54 at 22. Specifically, in preparing his opinions, Harris "reviewed the Complaint, NDME's supplemental initial disclosures, Working Agreements between NDME and various clients, NDME sales to specific clients, NDME's financial statements, and NDME's tax returns." *Id.* Further, National DME argues that "experts may assume causation and can rely on competing versions of the facts in forming their opinions." *Id.* at 23 (quoting *Allstate Ins.*, 2023 U.S› Dist. LEXIS 155388, at *3). National DME also notes that Katsikas provides her own expert report and that competing expert reports usually makes summary judgment inappropriate. *Id.* In her reply, Katsikas argues that

> Plaintiff's damages expert opined that Plaintiff suffered "future" damages of $182,646 based on a hypothetical contract term of 10 years and a hypothetical 90% chance that the Former Clients would have renewed their contracts twice, in 3-year increments, for a total term of 10 years. This opinion is unreliable as the assumptions used to reach it are belied by the factual record; for reasons unknown, Plaintiff's expert ignored governing contract language

ECF No. 56 at 14. Katsikas states that there is no reason to assume each contract—that lasts for three years—would be extended to last ten. *Id.*

First, I note that generally when there are competing expert reports, granting summary judgment is inappropriate as the competing reports demonstrate a genuine dispute of material fact. *See Sunset Landmark Inv., LLC v. Chubb Custom Ins. Co.*, 2018 U.S. Dist. LEXIS 222351, at *10 (C.D. Cal. Oct. 1, 2018). Although Katsikas does not provide an expert report with her motion, she discusses a rebuttal expert report in Harris's deposition, and concedes that one exists in her reply to National DME's opposition. *See* Harris dep., Pl.'s Ex. 15, ECF No. 53-4 at 7:3; ECF No. 56 at 14.

Further, Katsikas's issues with Harris's expert report do not render Harris's report so unreliable as to require exclusion. Katsikas asserts that Harris's decision to base the damages on the "hypothetical" ninety-percent chance that the Hand Institute would renew the contract and a "hypothetical" ten-year contract term makes his report unreliable and "belied by the factual

14

record." ECF No. 56 at 14. Further, Katsikas argues that "for reasons unknown, plaintiff's expert ignored governing contract language." *Id.* However, a quick review of Harris's report provides an explanation for those numbers. Harris writes, "I understand that Plaintiff intends to testify that 90% of their customer contracts get signed again, and that the typical customer life is best estimated to be ten years." Harris expert rep., Pl.'s Ex. 14, ECF No. 53-3 at 11. The reason for Harris's decision to base his damages calculation in part on these figures is well-explained and his analysis is within the confines of Federal Rule of Evidence 702. *See* Fed. R. Evid. 702 (stating that an expert may testify so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case"). Katsikas is certainly entitled to cross-examine Harris's decision to use these numbers should she so choose, but I do not find it appropriate to exclude Harris's report at this juncture. *See Leftenant v. Blackmon*, 2022 U.S. Dist. LEXIS 20373, at *21 (D. Nev. Feb. 4, 2022) ("[S]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." (internal citations omitted)). Therefore, a genuine dispute of material fact exists as to National DME's alleged damages and summary judgment is denied on this basis. I note, however, that any evidence of damages going forward must solely relate to the Hand Institute's contract, not the other two.

As explained above, there is no evidence in the record to suggest that Katsikas made any disparaging statements causing IOS and ASM to terminate their contracts with National DME. Therefore, Katsikas's motion for summary judgment on the intentional interference with contractual relations claim is granted as to any alleged interference by Katsikas relating to those two companies. However, as explained above, Katsikas's motion for summary judgment on the intentional interference with contractual relations claim is denied as it relates to the contract with the Hand Institute.

**B.  Katsikas is entitled to summary judgment on the breach of contract claim.**

National DME also brings a claim for breach of contract arguing that Katsikas breached the confidentiality agreement she signed because she "disclosed proprietary, confidential information to the Former clients" and used this confidential information for personal gain. ECF No. 13 at ¶ 31. In Nevada, to prove a breach of contract claim, a plaintiff must demonstrate (1) a valid contract exists, (2) there was a breach of the contract, and (3) damages occurred. *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919–20 (D. Nev. 2006) (citing *Richardson v. Jones*, 1 Nev. 405, 405 (1865)).

Katsikas first argues that she is entitled to summary judgment on the breach of contract claim because there is no evidence in the record demonstrating that she breached any agreement. ECF No. 51 at 23–24. In response, National DME states that the evidence supporting Katsikas's breach of the confidentiality agreement is as follows: (1) Katsikas asked the Hand Institute to obtain the Hand Institute's contract with National DME when she no longer worked at National DME—making the contract confidential, (2) Katsikas discussed the Hand Institute's contract with the Hand Institute's manager Gaje, (3) Katsikas stated that National DME did not provide logos on the Exos braces because it was not cost effective disclosed confidential information concerning National DME's internal processes, and (4) Katsikas told Dr. Barnes—who worked for University of Nevada, Las Vegas (UNLV) health—that National DME hired her, transferred all of her preexisting clients to it, and then fired her after the process was completed. According to National DME, not only is this false, but it describes internal operations for contracting with clients. ECF No. 54 at 23–24. In reply, Katsikas argues that National DME does not explain how the Hand Institute's contract, or discussions with Gaje or Barnes, are covered by the confidentiality statement.

As relevant here, Katsikas agreed to the following in the signed confidentiality agreement: "not to disclose or discuss any patient, member, human resources, and/or management information with others, including friends and family, who do not have a need-to-

know" and "not to access any information, or utilize equipment, other than what is required to do my job, even if I don't tell anyone else." Confidentiality agreement, Pl.'s Ex. 13, ECF No. 53-2 at 2, ¶¶ 1, 2. Turning first to the allegations that Katsikas violated the agreement by obtaining the Hand Institute's contract and discussing the contract with Gaje, the purpose of the confidentiality statement is to make sure that National DME employees understand the "legal and ethical responsibility to safeguard the privacy of all patients and to protect the confidentiality of their heath information." *Id.* at 2. There is no fear of sharing confidential health information where, as here, a company, not a patient, willingly shares its own contractual agreement with a third party. Further, to the extent that National DME feels that Katsikas's decision to ask the Hand Institute to provide its contract to her violates ¶ 2 of the confidentiality agreement—which states that she would not access information "other than what was required to do [her] job"—there is no evidence in the record indicating that the confidentiality agreement applied after Katsikas's termination. The agreement does not include any explanation as to when it would terminate and there is no evidence in the record that would allow me to find that the agreement controlled even after Katsikas left National DME. Indeed, although it is called a "confidentiality agreement" it reads more similar to a code of conduct with zero provisions about enforcement or termination. *See Royal Indem. Co. v. Special Serv.*, 413 P.2d 500, 502 (1966) (quoting *Reno Club v. Young Investment Co.*, 182 P.2d 1011 (1947) (A court "is not at liberty, either to disregard words used by the parties, descriptive of the subject matter or of any material incident, to insert words which the parties have not made use of.")). The facts demonstrate that Katsikas asked for the Hand Institute's contract after she was terminated. *Compare* ECF No. 13 at ¶ 12 (stating that Katsikas was terminated on July 20, 2023), *with* Katsikas texts, Def.s Ex. F, ECF No. 54-6 at 2 (July 26, 2023 conversation with Dr. Sorrelle asking him for the contract).

Therefore, it cannot be said that this behavior breached the confidentiality agreement, as there is no evidence the agreement applied at the time Katsikas asked for the contract and discussed the potential termination. This same logic applies to Katsikas's statement to Dr. Barnes: Katsikas spoke to Dr. Barnes after she was terminated. *See* ECF No. 54 at 8 (conceding that Katsikas spoke with Barnes after she was terminated); *see also* Barnes dep., Def.'s Ex. 9, ECF No. 52-9 at 14:18–15:9 (stating that the conversation occurred after July 26, 2023). And National DME's argument that Katsikas's statements about the costly nature of putting logos on Exos braces fares no better. National DME concedes that this statement is "false" yet also argues that the allegedly false-in-its-entirety statement somehow accurately describes a confidential process. National DME cannot have it both ways. Either Katsikas is telling the truth and spreading confidential information, or she is lying. There is not sufficient evidence in the record that would allow a reasonable jury to find that Katsikas breached the confidentiality agreement. Thus, Katsikas's motion for summary judgment on the breach of contract claim is granted.

### C. **The parties are directed to settlement.**

The parties are directed to attend a settlement conference before the assigned magistrate judge regarding the remaining intentional interference with contractual relations claim. LR 16-5. Should settlement be unsuccessful, the parties must file a joint pretrial order no later than thirty days after the conclusion of the settlement conference.

## IV. Conclusion

IT IS THEREFORE ORDERED that Katsikas's motion for summary judgment **[ECF No. 51] is GRANTED in part and DENIED in part.** Summary judgment is granted on the intentional interference with contractual relations claim as it relates to alleged interference with ASM's and IOS's contracts. Katsikas is also entitled to summary judgment on National DME's breach of contract claim. So the sole claim remaining is National DME's intentional interference with contractual relations as it relates to the Hand Institute's contract only.

This matter is referred to the magistrate judge for a settlement conference. Should settlement be unsuccessful, the parties must file a proposed joint pretrial order no later than thirty days after the conclusion of the settlement conference.

Dated: August 25, 2025

_____
Cristina D. Silva
United States District Judge